W. D. Haden Company v. Commissioner.
W. D. Haden Co. v. Commissioner
Docket No. 5789.
United States Tax Court
1946 Tax Ct. Memo LEXIS 221; 5 T.C.M. (CCH) 250; T.C.M. (RIA) 46089; April 9, 1946
B. L. Morse, Esq., 305 Haden Bldg., Galveston, Tex., for the petitioner. Homer J. Fisher, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: With respect to petitioner's income tax liability for the taxable years ended December 31, 1940 and 1941 respondent determined a deficiency of $4,506.86 *223 for 1940 and an overassessment of $8,306.59 for 1941. Respondent also determined a deficiency in excess profits tax of $54,008.79 for the year 1941. The deficiencies resulted from numerous adjustments to net income, some of which are not contested. The issues presented are outlined below. The questions submitted for decision may be briefly stated as follows: (1) Payments to Widow. Whether $600 paid in each of the years 1940 and 1941 to the widow of a former employee may be deducted as a business expense in both years. Section 23 (a) (1) (A). (2) Highland Farms Transaction. Whether $10,615.73, representing the difference between the uncollected balance of an original debt and the proceeds of the sale of installment contracts acquired in settlement of the debt in 1932, may be deducted as a capital loss in 1941 when the assets so acquired were resold to the debtor. Section 113 (a). Whether recoveries from the assets so acquired may be excluded from income in 1940 and 1941, including the exclusion of the proceeds of the sale in 1941. (3) Harrisburg Depot Transaction. Whether $10,760 may be deducted as a capital loss in 1941 upon the disposition of real estate; or whether the disposition *224 was an exchange for property of like kind which is not recognized as a loss. Section 112 (b) (1). (4) Williams Fee and Gravel Deposit. Whether $39,688.11, representing the adjusted cost of a leasehold interest, may be deducted as an ordinary loss by abandonment in 1941; or whether the cost of the leasehold and the recognized loss of the after-acquired fee interest both constitute a capital loss in 1941 upon sale of the fee interest. Section 23 (f). (5) Payment of Attorney's Fees. Petitioner claims a business expense deduction of $5,000. Section 23 (a) (1) (A). (6) Tax Liability of the Haden Company. Whether $21,135.98 paid in 1941 to discharge a tax deficiency assessed against a transferor may be deducted as an ordinary loss when paid; or whether such payment is a capital expenditure. Section 23 (f). Whether interest accrued both before and after the date of transfer may be deducted as a loss, or as interest. Section 23 (b). Whether expense of litigating said deficiency may be deducted under section 23 (a) (1) (A). (7) Haden Lime Company Transaction. Whether $21,975.99 may be deducted in 1941 as a bad debt upon liquidation of the debtor; or whether assets applied to the *225 redemption of preferred stock should first be applied to payment of the debt, thereby increasing the amount of capital loss upon redemption of preferred stock. Section 23 (k). Petitioner filed its returns for the periods here involved with the collector of internal revenue for the first district of Texas. The proceedings were submitted on a stipulation of facts, including exhibits, together with oral testimony and exhibits produced at the hearing. General Findings of Fact The facts which have been stipulated are adopted as part of our findings of fact and the stipulations are incorporated herein by reference. Petitioner is a corporation, organized under the laws of Texas, and is in the business of producing and selling building materials, including principally the production and sale of oyster shell. It also had interests in related businesses as will appear in the separate statements of fact concerning each issue. Unless otherwise stated the transactions hereinafter described all occurred in or near Galveston, Texas, which is petitioner's principal place of business. Issue I - Payments to Widow Findings of Fact J. E. Haden was an employee of petitioner since 1924. *226 He was the brother of W. D. Haden, the president and principal stockholder. J. E. Haden died in July 1935. His salary at the time of his death was $200 per month. He was a captain of tug boats until he became physically disqualified. He was then assigned to a shore job of a warehouse belonging to petitioner. He was paid at the usual and customary scale of compensation for the services rendered by him. The decedent left no estate except his home. His widow was not in very good financial circumstances at the time of his death. Petitioner's vice president and general manager, W. A. Wansley, authorized the payment of $50 per month to the widow. Payments have been made since the time of decedent's death because of (1) the poor circumstances of the widow and (2) the loyal services rendered by decedent to petitioner. The payments were not made pursuant to any resolution, but the action of Wansley was tacitly approved by the board of directors. Petitioner had no fixed policy of making payments to surviving widows of employees. In one other instance petitioner had made monthly payments to the widow of an employee until she remarried. Petitioner paid the sum of $600 in each of the years *227 1940 and 1941 to the widow of J. E. Haden. Opinion The question presented is whether the sum of $600 may be deducted as a business expense under section 23 (a) (1) (A) of the Internal Revenue Code in 1940 and 1941. Petitioner relies upon the portions of Regulations 103, section 19.23(a)-9, which are underscored: Sec. 19.23(a)-9. Pensions - Compensation for injuries. - Amounts paid by a taxpayer for pensions to retired employees or to their families or others dependent upon them, or on account of injuries received by employees, and lump-sum amounts paid or accrued as compensation for injuries, are proper deductions as ordinary and necessary expenses. Such deductions are limited to the amount not compensated for by insurance or otherwise. When the amount of the salary of an officer or employee is paid for a limited period after his death to his widow or heirs, in recognition of the services rendered by the individual, such payments may be deducted. * * * This amount of $50 a month, paid to the widow, in one-fourth of the monthly salary which had previously been paid to the decedent. It is contended that the payments have been made in consideration of *228 the past services of the deceased employee; that such payments have been reasonable; and that they come within the regulations because the period of payment is limited to the widow's lifetime or until her remarriage. The Commissioner disallowed such payments because, he concluded, "the annual payment of said amount is to be continued indefinitely." On brief he contends that the payments were not necessary expenses, that there was no contractual obligation nor any recorded recognition that such payments were for past services, that the payments "may have been made partially in discharge of the personal moral obligation" of decedent's brother, who was petitioner's president, and that there was no fixed policy whereby it could be argued that the payments were "business expenditures in the creation of good will on the part of employees." Respondent relies on Snyder & Berman, Inc., 41 B.T.A. 1180, 1184-5; affd., 116 Fed. (2d) 165; and Mobile Bar Pilots Association, 35 B.T.A. 12, 16; reversed on other grounds, 97 Fed. (2d) 695. In effect, respondent argues that notwithstanding the regulations the payments are not deductible under the *229 statute. Petitioner relies upon the regulations, I.T. 3329, C.B. 1939-2, p. 153; and General Smelting Co., 4 T.C. 313. The services had been rendered by the employee prior to his death in 1935. The Supreme Court has held that the services need not be actually rendered during the taxable years. See Lucas v. Ox Fibre Brush Co., 281 U.S. 115, in which deductions were allowed for reasonable additional compensation granted to employees during the taxable year in recognition of services rendered in prior years. In this case we have found that the payments were made partially in recognition of services rendered by the decedent, but we have also found that the poor circumstances in which the widow was left by his death was an equal, if not the primary, inducement for the payments. Furthermore, we have found that the decedent during his lifetime was paid at the usual and customary scale of compensation for his services. On these facts, and in the absence of any other evidence relating to the value of the services actually rendered, we are unable to determine that the payments are in fact additional compensation. The payments are to be limited to the widow's lifetime *230 or remarriage. They do not have any relation to an amount representing the value of services rendered. Even if we could find an element of compensation in the payments, the facts do not furnish evidence that the payments to the widow, when added to the salary previously paid, are reasonable in amount for the services actually rendered, as is required by the statute. In the absence of a finding that the payments made to the widow are in the nature of additional compensation, and in the absence of a contract with the deceased employee for such payments, they must be considered as gifts which are not taxable to the recipient under section 19.22(a)-2 of the pertinent regulations. [1] Cf. Bogardus v. Commissioner, 302 U.S. 34. Are such payments, however voluntary, none-the-less ordinary and necessary business expenses of the petitioner, and thus deductible within the meaning of the statute, supra? We think this question is controlled by Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 294: It is a question of fact in each case whether a donation is made to an institution conducted for the benefit *231 of the donor's employees or is consideration for a benefit flowing directly to the donor as an incident of its business. Here the ruling of the Commissioner, that the deduction was not permissible under the statute and regulations, presumably rests upon a correct determination of the facts. Welch v. Helvering, 290 U.S. 111, 115, 54 S. Ct. 8, 78 L. Ed. 212. The Board of Tax Appeals found that the gifts to the San Francisco Community Chest were apportioned among the charitable organizations of the City and that the gifts of petitioner were made in the belief that "they resulted in good will toward the petitioner and increased its business." But the Board made no finding of any direct benefit to petitioner's employees or business which the regulations contemplate. Nor was there evidence before it to support such a finding. * * * It is argued by petitioner that there was a fixed policy evidenced by similar payments made to the widow of another employee until she remarried. We do not think that this isolated example establishes a fixed policy of paying pensions to widows. There is no evidence in the corporate minutes or elsewhere that petitioner had a pension plan or had *232 previously paid pensions to retired employees who had actually rendered services. There is no evidence that the donations to the widow were made for the benefit of the petitioner's business. See Old Mission Portland Cement Co. v. Helvering, supra. It is held that the payments to the widow are not deductible as ordinary and necessary business expenses of petitioner. See Mobile Bar Pilots Association, supra; Carpinter & Baker, Inc., 9 B.T.A. 165, 169; affirmed per curiam, 30 Fed. (2d) 1009; cf. Botany Worsted Mills v. United States, 278 U.S. 282. General Smelting Co., supra, on which petitioner relies, involved payments to an employee, not to his widow, under an agreement which provided a pension for past services and compensation for services actually being rendered. The case is distinguishable on its facts. Counsel have not cited, and our research has failed to disclose, any decision in which voluntary payments to the widow of a deceased employee have been held to be deductible under section 23 (a) (1). Respondent's regulation, section 19.23(a)-9, supra, represents administrative interpretation under *233 section 23 (a). Deductions are a matter of legislative grace. In allowing a deduction for payment of the salary of a deceased employee to his widow for a limited period after death, respondent takes a position which appears to be reasonable under the statute. He has denied the deduction claimed upon a holding that his regulation does not apply in the present instance. Since petitioner has not shown that the payments in question are to be paid for a limited period of time, we sustain respondents' determination. Issue II - Highland Farms Transaction Findings of Fact During the period July 1930 to October 1931 petitioner advanced the Highland Farms Corporation the total sum of $29,116.90. Thereafter, in 1931, Highland Farms Corporation assigned certain land sales contracts (numbering 89 as of January 19, 1932) to petitioner to secure such indebtedness. On January 19, 1932, Highland Farms Corporation conveyed 123 town lots and farm tracts in the Highland Farms subdivision project to petitioner, subject to a mortgage held by the Fidelity Trust Company. The grantor also assigned three second lien notes secured by certain of said properties. By collateral agreement of the same date, *234 petitioner accepted the conveyances subject to the outstanding sales contracts and received the right to declare forfeitures under said contracts and to enforce all of the rights of the original vendor. The agreement also contained provisions for the payment of releases to the mortgagee, and other provisions applicable in the event of a foreclosure of the mortgage. The deed and assignments were accepted by petitioner in settlement of the indebtedness due by Highland Farms Corporation. The total sum of uncollected balances on the assigned sales contracts was $46,785.33 as of January 19, 1932. The total sum of release prices payable under the mortgage to Fidelity Trust Company was approximately $19,175.22, leaving a net balance of $27,610.11. However, the Fidelity Trust Company had refused to accept the proportionate amount of collections which petitioner deemed that the interest of the mortgagee bore to the total collections on the assigned sales contracts. The mortgage was then in default. Petitioner had no independent appraisal made of either the properties or the sales contracts received from the Highland Farms Corporation. No allocation of a cost basis was made among the various *235 properties acquired from said corporation, but separate accounts were maintained for each property. The sum of $29,116.90 previously owed by the Highland Farms Corporation was used as the cost basis for all of the properties. Practically all of the properties in the Highland Farms development were sold on a contract basis covering a period of six or more years at a list price rate of $200 per acre, payable in installments of $10 or less a month. The list prices remained constant and were equivalent to the sales prices on the contracts during all times important to the present controversy. There was no comparable sale of a large number of sales contracts or lots and acreage in the year 1932 and the sales prices of competing properties, if any, are not disclosed. On May 28, 1932, foreclosure proceedings were instituted by the holder of the mortgage, Fidelity Trust Company, and petitioner was named as a party defendant. Because of this suit, petitioner wrote off the sum of $29,116.90 in 1932. However, the return for 1932 showed a loss and no tax benefit resulted from the writing off of this "asset." In 1935 the litigation resulted in a judgment for damages in favor of Highland Farms *236 Corporation on a cross action. This included a release of the mortgage on the properties conveyed to petitioner. The "asset" previously written off in 1932, less credits of $1,019.33 applied during pendency of the suit, was thereupon restored on the books at the net amount of $28,097.57. This net amount was reported as income in the year 1935, but the return for 1935 showed a loss so that no tax resulted from including the above amount in income. During the years 1935 through 1941, petitioner collected a total of $8,231.84 from assigned sales contracts, notes and cash sales of lots, which was applied against the restored balance of $28,097.57, leaving a net balance of $19,865.73. The collections and sales were made by Highland Farms Corporation as agent for petitioner and deposited in petitioner's bank account less commissions and necessary expenses. Subsequently, on December 19, 1941, petitioner resold all of the remaining properties and contracts to Highland Farms Corporation for $9,250 in cash. Petitioner deducted the sum of $10,615.73 as a long-term loss resulting from the resale of the remaining properties and contracts to Highland Farms Corporation in 1941. This amount represents *237 the difference between the uncollected balance of the indebtedness originally owed to petitioner in 1932, which was said to be $19,865.73, and the proceeds received from the Highland Farms Corporation in December 1941, $9,250. The Highland Farms Corporation collected approximately $29,000 upon the remaining contracts which it repurchased from petitioner for $9,250. The gain was reported by the Highland Farms Corporation in its return. The following collections made by petitioner were held to constitute taxable income by the Commissioner: Collections 1940
$ 680.00
Collections 1941
$3,344.90
Proceeds of sale, 1941
9,250.00
12,594.90
Opinion (a) In 1932 petitioner acquired certain installment contracts and land in settlement of a debt of $29,116.90 owed by the Highland Farms Corporation. Thereafter petitioner made collections upon the contracts so that the uncollected balance of the original amount of the debt was $19,865.73 in 1941. During 1941 petitioner resold the remaining contracts and land to the Highland Farms Corporation for $9,250, leaving $10,615.73 uncollected. Petitioner deducted $10,615.73 as a longterm loss during the taxable year 1941. *238 The Commissioner disallowed this deduction. The first question is whether petitioner has sustained a loss upon resale of the remaining contracts and land within sections 111 (a) and 113 (a) of the Internal Revenue Code. [1]
Petitioner contends that the cost of the properties acquired in settlement of the debt is the amount owed by Highland Farms Corporation in 1932 or $29,116.90. The respondent contends that the basis of the property acquired in settlement of a debt is its fair market value at the date of acquisition. Respondent also contends that the cost or other basis *239 of the property should have been allocated or apportioned to the component units acquired by petitioner. The general rule is that the basis of property for determining gain or loss is its cost to the taxpayer. Section 113 (a), supra. But where the property is acquired (as here) in satisfaction of an indebtedness, and subsequently sold, the basis for determining gain or loss is the fair market value of the property at the date of acquisition. Bennett v. Commissioner, 139 Fed. (2d) 961. The receipt of property so acquired, to the extent of its fair market value at that time, is considered as a payment on the indebtedness. The unpaid portion of the debt then becomes deductible as a bad debt, if it becomes worthless within the taxable year. John H. Wood Co., 46 B.T.A. 895; First National Bank, Philipsburg, Pa., 43 B.T.A. 456; I.T. 3548, C.B. 1942-1, p. 74; Commissioner v. Spreckels, 120 Fed. (2d) 517; Commissioner v. National Bank of Commerce of San Antonio, Texas, 112 Fed. (2d) 946; Bingham v. Commissioner, 105 Fed. (2d) 971. Petitioner does not seriously dispute the principles of law above stated, but *240 contends that in this case the property was purchased for the amount of the debt, citing Howard W. Starr, 1 B.T.A. 681. In that case stock was issued in payment of an indebtedness to a stockholder and this was held to be the equivalent of a purchase of stock for cash, which should be taken into consideration in determining the cost of the stock when sold. A careful reading of that case shows, however, that value of the stock at the time of the settlement was considered to be equal to the amount of the debt. We find nothing in that case which is in conflict with the principle above stated. Bennett v. Commissioner, supra. Petitioner agrees that all of the property acquired from Highland Farms in 1932, consisting of notes and contracts of sale, secured by lots and acreage subsequently conveyed, constitutes the property which must be valued. Neither the assigned sales contracts nor the lots and acreage were independently appraised in 1932 or at any time thereafter. The only evidence of value offered by petitioner is the testimony of an officer of Highland Farms Corporation to the effect that the fair market value was equal to list prices on the assigned contracts *241 and that the sales prices, and presumably the amounts realized, were equal to the list prices. The facts show that the total uncollected balances on the contracts, less amounts payable for releases to the mortgagee, were $27,610.11, as of January 19, 1932. Respondent contends that neither $29,116.90, the amount of the debt owed to petitioner in 1932, nor $27,610.11, the then net uncollected balances on the assigned sales contracts, constitutes the cost basis of the property for the purpose of determining gain or loss. The contracts were payable in monthly installments over a period of six or more years. Respondent argues that anyone buying these contracts in 1932 would require a discount which would enter into the fair market value of the property. With this contention we agree. The undiscounted sales prices of the assigned contracts cannot be accepted as satisfactory evidence of fair market value. See Montrose Cemetery Company v. Commissioner, 105 Fed. (2d) 238; affirmed per curiam, 309 U.S. 622. It is clear that petitioner's witness used the term "fair market value" to describe the total selling price at which he estimated the properties could be sold *242 over a period of years in small monthly installments. This value ignored discount factors. No purchaser of installment contracts would be willing to buy such contracts without discount for the time factor, the risk of defaults in the contracts, and a substantial discount for service and other expenses. In the hands of petitioner the contracts, and the lots subsequently conveyed subject to these contracts, were so much "paper" with "long deferred payments." They were so described by petitioner's vice president and general manager. In fact, in 1941 he agreed to resell the contracts to Highland Farms at a discount of "50 cents on the dollar as the property stood on our books." It would not be unreasonable to assume that approximately the same rate of discount would have been applied in determining the fair market value of the contracts in 1932. Applying such a discount, the fair market value of the property in 1932 would have been about $13,805 (50% of $27,610.11). If that were petitioner's basis, there would not be any loss in 1941 upon the resale of the property to Highland Farms. Petitioner has failed to meet its burden of proof. It had not established the fair market value in 1932 *243 of the property in question. Therefore, it has not established its basis for computing gain or loss in 1941. The evidence does not support a finding of fact that the property in question had a fair market value in 1932 of $29,116.90 as petitioner contends. In addition to what has been stated above about discount factors, it is noted, further, that at the time the property was acquired, a suit to foreclose the blanket mortgage was threatened. The mortgage lien came ahead of the sales contract liens. Foreclosure proceedings on the mortgage were commenced within a few months after the contracts were assigned in 1932. The threat of foreclosure was bound to have had a depressing effect upon the fair market value of the properties acquired in the settlement. It is a fact that after the foreclosure of the mortgage, the petitioner wrote off the Highland Farms account in full. One of petitioner's witnesses testified, "Of course, when we were threatened with suit we didn't know whether we had anything or not." Respondent also contends that petitioner has failed to meet its burden of proof because it has not allocated or apportioned the cost or other basis of the properties to the units *244 acquired in the settlement with Highland Farms Corporation. He asks us to apply by analogy section 19.22(a)-11 of Regulations 103, which deals with the sale of real property in lots, to the present proceeding. The end to be served in applying this rule to properties acquired in bulk is that any gain derived from the sale of a component unit will thus be returned as income for the year in which the sale is made. See Heiner v. Mellon, 304 U.S. 271, 276, and cases cited therein. In view of our decision that petitioner has failed to prove the fair market value of the properties at the date of acquisition we need not pass upon respondent's contention. Respondent's disallowance of the deduction claimed in 1941 in the amount of $10,615.73 is sustained for failure of proof. Respondent made several adjustments in petitioner's long-term capital losses for the year 1941 which resulted in the allowance of additional deductions for long-term capital losses in the amount of $52,603.45. This figure is a net amount which results from respondent's computations from all of his adjustments of the allowable deductions for long-term capital losses, in which adjustments the long-term capital *245 loss of $10,615.73 was held not to be deductible. (b) In determining the deficiencies for the years 1940 and 1941, respondent added to petitioner's income, under the heading of "Recoveries in taxable year," the sum of $680 in 1940, and the total sum of $12,594.90 in 1941. The latter figure represents the total of recoveries under contracts, referred to above, in the amount of $3,344.90, and the amount received upon the resale of the properties to Highland Farms, $9,250. In the petition, petitioner alleged that respondent erred in treating these recoveries "as bad debts recovered." On brief petitioner makes no reference to the recovery of bad debts. Respondent, in his explanations attached to the notice of deficiency, did not refer to these amounts as recoveries of bad debts, but referred to them as collections land contracts of notes. In his explanation, respondent stated that these recoveries were considered to be income. On brief, petitioner has not squarely met the issue presented by these particular determinations in 1940 and 1941. It is evident, however, that petitioner treated the collections under the sales contracts in the amounts of $680 and $3,344.90 as part of the collections *246 under the assigned sales contracts which totaled $8,231.84 during the period 1935 through 1941, which amount is referred to in the findings of fact under this issue. Petitioner regarded the basis of all of the property as being $28,097.57 in 1935 when the property was restored to its books as an asset. Petitioner had originally regarded the basis as being $29,116.90; prior to 1935 collections were made in the amount of $1,019.33; which reduced the basis on the books to $28,097.57. Then, petitioner applied total collections under the contracts up to December 1941 in the total amount of $8,231.84 as a further recovery of capital, reducing the basis to $19,865.73. When petitioner resold the remaining property to Highland Farms in December 1941 for $9,250 in cash, petitioner treated the difference as a loss of $10,615.73. In our opinion petitioner has been in error in its method of handling the account for the sales contracts. Petitioner has not only failed to establish in this proceeding what the cost basis of the property was for purposes of computing gain or loss in 1941, but petitioner has also failed to provide any evidence upon which a determination can be made with respect to *247 the collections under the sales contracts in the amount of $680 and $3,344.90. It would appear that some capital, and part thereof might constitute income, but from the record we are unable to determine which is true. We are obliged to hold that petitioner has failed to overcome the prima facie correctness of respondent's determination that collections in the amount of $680 and $3,344.90 in 1940 and 1941 represented income. With respect to the proper treatment of $9,250, received upon the resale of the property to Highland Farms, the situation is different. This amount, of course, does not represent collections under the sales contracts. It represents the total consideration paid by Highland Farms for the remaining sales contracts and land. It may represent gain, or it may represent loss. The absence of the necessary evidence makes it impossible for us to make a determination. Accordingly, for failure of proof respondent's action in adding the above amount to income must be sustained. Issue III - Harrisburg Depot Transaction Findings of Fact Petitioner owned lot No. 16, Harrisburg Depot Grounds, which was acquired in 1926 for $18,000 and, together with capital improvements, *248 was carried on petitioner's books in 1940 at a cost of $18,560.60. The adjoining lot No. 15 on the south was owned by A. S. Beeley, operating under the firm name of Texas Pipe Bending Company (hereinafter called Beeley). A son, J. A. Beeley, acted for his father in most of the transactions described hereinafter. The adjoining lot No. 17 on the north was owned by The Texas Company (hereinafter called the oil company). To the north of this lot and across an intervening street petitioner was doing business on leased property. All of the properties mentioned had water frontage on old Buffalo Bayou. About August 1940 Beeley desired to acquired half of petitioner's lot No. 16, which had 200 feet bayou frontage, but petitioner did not wish to sell half of its lot because it desired to retain all of the water frontage. Petitioner had acquired lot No. 16 as a precaution against the loss of its nearby leased property. The oil company's lot No. 17, which had about the same water frontage as lot No. 16, had been for sale for some time but petitioner had no desire to buy additional water frontage. An independent real estate man, A. O. Goodwin, who had formerly been associated with the oil *249 company, perceived the possibility of working out a deal involving the petitioner's lot No. 16 and oil company's lot No. 17, respectively. Petitioner's officers were approached by Goodwin. They rejected a proposal to pay Goodwin a commission of $750 but agreed to trade lot No. 16 for lot No. 17, if the deal involved no expense to petitioner. There was no difference in the value of the respective lots to petitioner. On October 21, 1940, Goodwin made a written offer to the oil company to purchase lot No. 17 for $7,800 net. The material portions of this offer are as follows: Texas Company, Houston, Texas
Offer to Buy, Harrisburg Bulk Plant * * *
Gentlemen: Price offered - $7,600.00 net to Texas Company; that is, without any liability to pay a real estate commission. * * *
W. D. Haden & Company will be the ultimate buyers of your property if a deal can be made. The Texas Pipe Bending Company adjoining Haden on the East want some of the Haden property. If they cannot get it reasonably they will buy elsewhere. In fact they have another property selected on which they were about ready to put up earnest money. May I have your answer as promptly as possible, for this reason. *250 I have submitted this property also to Brown & Root. Yours very truly, A. O. GOODWIN, 1550 Westheimer St. On November 1, 1940, Goodwin advised petitioner by letter of his bid to the oil company, and offered, if the bid were accepted, to exchange the oil company's lot No. 17 for petitioner's lot No. 16. Petitioner agreed in writing to this exchange on the same date. The agreement of the parties is as follows: Houston, Texas, November 1, 1940 W. D. Haden Company, Houston, Texas Gentlemen: Contemplating a trade or exchange of property in accordance with conversations with Mr. Wamsley [Wansley], I have made a bid to the Texas Company for their property, the north 190 feet of Block # 2, Harrisburg Townsite, fronting 190 on Old Buffalo Bayou and extending back to the alley on the west, said tract adjoins your property in said block on the north. Should my bid be accepted I will exchange and deed to you this Texas Company tract for the whole of your property in Block # 2, Harrisburg townsite having a width of 200 feet along the alley on the West of said property and extending between paralell [paralell] lines to the Old Buffalo Bayou, containing 1.0727 acres of land more or *251 less, on the following conditions: Consideration: The exchange of property for porperty [property] without added cash consideration by either party. Taxes and Rents: Each party will furnish tax certificates showing all taxes paid up to and including 1930, and Each party will pay their respective 1940 taxes and furnish each for the other tax receipts for 1940 on or before past due dates for the payment of such taxes; Rents will be prorates as of date of deed. Title: Each party will furnish to the other complete abstracts of title, or inlieu thereof a guaranteed title by a reputable title guaranty company. Should abstracts be furnished, ten days shall be allowed after the delivery of such abstract for the examination of title and the acceptance or rejection of title, and twenty days after the report of title defect for the curing of the same. Should title fail on either property or should the present bid by me be rejected then either party may declare this agreement to exchange void, and in such event both parties shall be relieved of any further liability hereunder. Yours very truly, A. O. GOODWIN, A. O. Goodwin A. O. Goodwin: We agree to the exchange of our Buffalo Bayou *252 property for the Old Texas Bulk plant property adjoining us on the north on the basis outlined in you letter above. W. D. Haden Company, W. A. Wansley November 1st 1940. On the same date, November 1, 1940, Goodwin agreed by written contract to sell 150 feet of petitioner's lot No. 16 to Beeley for $7,800 cash, subject to the acceptance of the bid previously submitted to the oil company. In this agreement Goodwin represented himself as the principal and not as agent. He applied for title insurance on the property as vendor in the amount of $7,800 and named Beeley as vendee. Beeley made a deposit of $500 to be held in escrow by the title company. About November 15, 1940, Goodwin was advised that his offer to the oil company to purchase lot No. 17 had been accepted. The title company notified Beeley of this fact by letter, and similar notice was sent to, and acknowledged by, petitioner. Some time later, but prior to settlement, Beeley agreed with Goodwin to purchase petitioner's entire lot No. 16, including the 50 feet originally reserved by Goodwin for himself, for an additional sum of $3,000, making the total consideration $10,800. The material portions of the agreement, as *253 amended, are as follows: THE STATE OF TEXAS County of Harris] BY THIS AGREEMENT AND CONTRACT, A. O. Goodwin, hereinafter called Seller, acting through the undersigned and duly authorized Agent, hereby sells and agrees to convey unto A. S. Beeley, hereinafter called Purchaser, the following described property: Lying and situated in the County of Harris, State of Texas, Two Hundred (200) AOG The South One Hundred Fifty (150) Feet of the W. D. Haden property * * *
$10,800 AOG The purchase price is $7,800.00, payable as follows: Houston Title Guaranty Co., $500.00 all Cash (of which Purchaser has deposited with the undersigned Agent $ as part payment, receipt of which is hereby acknowledged by said Houston Title Guaranty Company This sale is subject to the purchase by the seller herein of the Texas Company's property out of Block # 2, Harrisburg Twonsite [Townsite], adjoining the W. D. Haden Company property on the North; confirmation of said purchase to be deposited with the Houston Title Guaranty Company on or before November 15, 1940, failing which the purchaser herein may request the Houston Title Company to refund to him his deposit of $500.00, such refund shall *254 void this agreement to purchase and will release both parties hereto from any further liability hereunder; the delivery to the Houston Title Guaranty Company and the purchaser herein of a notice of confirmation of agreement to purchase from the Texas Company of its property by the seller herein or his nominee shall made this agreement operative as hereinafter outlined with the understanding that if the Texas Company title fail then this agreement will be of no effect as to either seller or purchaser herein. * * * It is understood that A. O. Goodwin is acting as principal and not as agent and that purchaser is not liable to him for any commission for consumating this deal, and that seller is to furnish Guaranty Title policy without cost to purchaser. November Executed in triplicate this 1st day of October 1940 This contract subject to the acceptance of Seller. 11-1-40 Received $500.00 to be held in escrow in accordance with above contract. HOUSTON TITLE GUARANTY COMPANY by Howard C. Lee, Attorney Agent for Accepted: A. O. GOODWIN, Seller., A. S. BEELEY, Purchaser., George E. Duckworth, WITNESS: It was originally intended by Goodwin that he would take title to petitioner's *255 lot No. 16 and then convey 150 feet thereof to Beeley. A deed was prepared which named Goodwin as grantee. The amended agreement altered Goodwin's intention to take title in his name. In another deed, ultimately executed by petitioner, the name of Beeley as grantee was substituted for that of Goodwin, which had been erased. The substitution was made before the deed was seen by officers of petitioner, and before acknowledgment. At the settlement, and at Goodwin's request, the transaction was closed as follows: The oil company conveyed lot No. 17 directly to petitioner and petitioner conveyed lot No. 16 directly to Beeley. Execution of the latter deed was authorized by petitioner's board of directors upon formal motion, copy of which appears in the margin. [1] The only cash which passed in the transaction was furnished by Beeley, who paid $7,800 to the title company which was holding the $500 earnest money. No cash was paid or received by petitioner. The title company disbursed the money paid to Beeley as follows: To
Title company
$ 9.30
for account of Goodwin
50.00
$ 59.30
Goodwin
136.50
Oil company
7,604.20
Total
$7,800.00
*256 The additional sum of $3,000 was paid by Beeley directly to Goodwin. The cost to petitioner of the oil company's lot No. 17 was recorded in its corporate books as $7,800, which represented the amount received by the oil company plus taxes and other expenses. The account carried on petitioner's books for lot No. 16 was thereupon credited with $7,800, leaving a balance in the account of $10,760.60, the cost having been $18,560.60. Petitioner charged $10,760.60 to profit and loss. Petitioner claimed a deduction in its return for 1940 of $10,760.60 as a long-term capital loss. Petitioner exchanged lot No. 16 for the oil company's lot No. 17, which was property of like kind, during the taxable year 1940. Opinion The question presented is one of fact. Petitioner, at the instance of another party, conveyed a lot to a third party and concurrently took title to an adjacent lot conveyed by a fourth party, without expense to petitioner. The transaction was treated by petitioner as a sale and a long-term loss was deducted in the taxable year 1940. Respondent determined that the alleged loss was not deductible because the transaction was an exchange of property for property of a like *257 kind, which comes within the provisions of section 112 (b) (1) of the Internal Revenue Code. [2] Under that section no gain or loss is recognized. The contention of petitioner appears to be wholly without merit. The transaction, so far as petitioner was concerned, resulted in an exchange of property. Petitioner does not contend that lot No. 16 was not held for productive use in trade or business or for investment. It appears that it was held for some one of those purposes. The transaction comes squarely within the terms of section 112 (b) (1). Petitioner's bookkeeping *258 entries do not reflect the transaction as it was carried out in that petitioner did not provide any of the cash that was used in the transaction, and petitioner received no cash. Since no gain or loss is recognized upon an exchange of property for property of like kind under section 112 (b) (1), the basis of lot No. 16 carries over and becomes the basis of the lot which was received in exchange, lot No. 17. In general, the distinction between a sale and an exchange is that consideration is expressed in terms of money in a sale, while in an exchange of property, the consideration consists of other property. Mertens, Law of Federal Income Taxation, Vol. 3, p. 142, section 20.28. The issue must be decided upon the basis of what was done. Petitioner could have transferred title to lot No. 16 to Goodwin upon receipt of cash consideration from him; and petitioner could have purchased lot No. 17 from the owner upon the giving of cash consideration. Perhaps in this two-step transaction, Goodwin would have collected a commission from petitioner. Whatever the reasons were, the transaction was carried out under a method which avoided the two steps suggested above. The result was that petitioner *259 gave up title to lot No. 16 and received title to lot No. 17 without having to pay any commission and without resorting to the transfers of any cash consideration. The entire transaction is unusual. Beeley owned lot No. 15. Under the transaction he acquired title to lot No. 16. No consideration passed from Beeley to petitioner. Beeley did not acquire any property from Texas Company, but Texas Company received cash from Beeley through Goodwin. Petitioner received lot No. 17 from Texas Company but no cash consideration passed from petitioner to Texas Company. The transaction was perhaps a novel one, but the net result, so far as petitioner was concerned, was that petitioner gave up property of a certain kind and received like property. So far as petitioner was concerned there was an exchange of property for like property. With respect to Beeley and Texas Company, Beeley received property and paid a cash consideration. Under this issue respondent's determination is sustained. Issue IV - Williams' Fee and Gravel Deposit Findings of Fact J. S. Williams, Add Williams and others whose names are immaterial to this issue, owned a tract of land in Fayette County, Texas, which contained *260 gravel and sand deposits. On June 16, 1928, the Westpoint Company, a Texas corporation, hereinafter called Westpoint, acquired certain rights with respect to the gravel and sand in and under a certain 53 acres of land in Fayette County, Texas, by written lease from J. S. Williams, et al. Under the lease the grantee had the right to keep it in force by mining operations or by payment of delay rental of $250 for any year in which mining did not occur; the grantee agreed to pay as royalties five cents per cubic yard for all washed gravel and three cents per cubic yard for all pit-run gravel mined and produced, and three cents per cubic yard on any sand mined and sold by the grantee for forty cents per cubic yard or more; the grantors retained all other interests in the property except that the grantee obtained the right of ingress and egress for the purpose of mining the gravel; the grantors retained the right at their option to repossess the leased property in the event of default in the payments provided for. The lease contract was declared to be binding upon and inure to the benefit of the heirs, successors or assigns of the parties thereto. On February 14, 1929, Westpoint sold *261 all of its rights in the above lease of June 15, 1928, to petitioner. Petitioner assumed all of the rights and obligations under said lease. There were seven persons who owned the fee to the 53 acres, six of whom sold their undivided interest in said property to petitioner during the period November 26, 1930, to March 26, 1931. One owner, Add Williams, did not convey his interest at the time of the foregoing conveyances. He retained his one-seventh undivided interest in the whole tract until December 16, 1939, when he conveyed all of his right, title and interest in 47 acres out of the 53 acres to petitioner, for the purpose of partitioning the tract. On December 9, 1939, petitioner had conveyed to Add Williams six acres out of the 53 acres by deed which was given for the purpose of partitioning the tract, and the deed to petitioner was in consideration thereof. Of the total amount paid by petitioner in the acquisition of sand and gravel leases on various properties from Westpoint, it has been stipulated that "the amount of $47,334.04 has been allocated as the cost to W. D. Haden Company of the lease on the Williams tract, which lease was acquired by W. D. Haden Company on February 14, 1929, as *262 shown hereinabove." It is stipulated that in the years in which depletion was claimed, 1932, 1935 and 1936, no depletion was claimed or taken by petitioner on the $2,400 which was the cost of the fee interest in the Williams tract. As has been stated above, petitioner purchased the undivided six-sevenths interest of six persons in the tract, and the stipulation of facts indicates that $2,400 was paid for the six-sevenths interest. It seems to follow that the $2,400 was paid for all interests in the portion which was purchased, including the mineral rights, i.e., the gravel deposits, so that the stipulation relating to not taking any depletion on the $2,400 evidently means that petitioner or respondent allocated the cost of $2,400 to all interests except interests in the gravel. This seems to have been a matter of accounting, as far as the record shows. On or about February 2, 1933, petitioner gave a gravel and sand lease to S. & G. Company, for three years, beginning February 1, 1933, and ending January 31, 1936, unless sooner terminated. This was a new lease, which leased various tracts owned or leased by petitioner, including the six-sevenths undivided fee interest in the 53 *263 acres known as the Williams tract, upon terms and conditions for rent and royalty payments which were different than those provided in the lease which had been assigned to petitioner by Westpoint. This lease was extended for an additional term of five years, ending January 31, 1941. Petitioner was a stockholder in the S. & G. Company, owning 14.92 percent of the total stock. The balance of the stock was owned by three gravel producing companies who with petitioner organized the S. & G. Company in 1933, in order to operate their various properties more economically. The S. & G. Company terminated the lease agreement with petitioner in about April or May 1940 by dissolution of the corporation. The petitioner then, in May 1940, moved onto the said 47 acre tract, its own machinery and equipment and mined the sand and gravel until about January 1941. On March 17, 1941, the petitioner made a lease agreement with the Texas Construction Material Company for the purpose of extracting gravel and sand, and the Texas Construction Material Company continued to operate the properties until July 5, 1941. This was a new lease, which leased all of the gravel properties owned or leased by petitioner, *264 including the whole fee interest in 47 acres of the Williams tract. The one-seventh undivided interest acquired from Add Williams is not specifically mentioned but it had been conveyed prior to the execution of this lease and was covered by its general terms. In the lease there is no reference to any existing leases nor are there any provisions for payments under any existing leases. The terms and conditions in this lease for rent and royalty payments are different than those provided in the lease assigned to petitioner by Westpoint, and from those provided in the lease given by petitioner to the S. & G. Company. The fee title to the Williams tract was acquired by petitioner for the purpose of eliminating payments due under the lease agreement assigned to petitioner by Westpoint. Add Williams was paid one-seventh of all royalties until the tract was partitioned by him and petitioner in 1939. The Williams tract was but one of several sand and gravel deposits from which petitioner's customers were supplied. The Williams tract had a ten cent per ton higher freight rate than the rate established for other deposits located at Columbus, Eagle Lake, and Victoria, Texas. When a greater *265 demand for gravel originated in the Houston territory, the deposit in the Williams tract was not operated. When the Williams tract was operated by petitioner during 1940, there was no market in the immediate territory and the operations were conducted on a small scale. This venture was not profitable. The Texas Construction Material Company was the largest producer of sand and gravel in south Texas. It was an experienced mining operator. If any deposits could be extracted from the Williams tract, it had the personnel and equipment necessary for producing gravel. The Texas Construction Material Company gave up its lease with petitioner because the recovery of gravel from the Williams tract was found to be commercially unprofitable under any known method of mining, including flotation. The deposit was too full of mud and soapstone to be recoverable as saleable gravel. In the language of the business, it was a "playedout" deposit. No gravel has been mined from the Williams tract since the surrender of the lease on July 5, 1941. At all times petitioner kept separate accounts on its books for its investment, separating investment in gravel deposits and in the fee interest in the Williams *266 tract. Thus, there were two accounts on petitioner's books. As of July 5, 1941, the balance of the account for the investment in the gravel deposit or in the lease originally acquired from Westpoint was stated to be $39,668.11, and the balance in the other account was $2,400, representing the investment in the fee title to the Williams tract. No depletion of the gravel was claimed on petitioner's income tax returns or accrued upon its books for the years 1937 to 1941, inclusive, because production was considered too small. The following amounts of gravel, given in cubic yards, were extracted from the Williams tract by successive producers: Unspecified
S. & G. Co.
Petitioner
T.C.M. Co.
1929
none
1933
none
1940
9,286
1941
1,659
1930
none
1934
none
1931
none
1935
6,944
1932
46,994
1936
6,346
1937
1,376
1938
540
1939
17,139
On December 16, 1941, petitioner sold and conveyed the fee title to the remaining 47 acres of the Williams tract to C. J. Wansley, a brother of petitioner's, then vice president, for the sum of $329. The tract then had no value other than the value of the surface rights. *267 Offers had been solicited by petitioner in order to establish a loss. The proceeds of the sale represented the fair market value of the tract, including whatever remained of the gravel deposit. The amount which remained as unrecoverable gravel on the books of petitioner as of July 5, 1941, $39,668.11, was charged to profit and loss at the end of the taxable year 1941 as an abandonment. This amount was claimed as an ordinary loss from abandonment in petitioner's 1941 income tax return. The difference between the cost on the books of the fee interest, $2,400, and the proceeds of the sale in 1941, $329, was claimed as a capital loss in petitioner's return for 1941. In determining the deficiency for the year 1941, respondent made adjustments in the allowable deductions for long-term capital losses, increasing the allowable loss deductions by the net amount of $52,603.45. In this net amount respondent included, and allowed to petitioner a long-term capital loss of $43,314.19 on the sale to Wansley of the Williams fee interest and gravel deposit, i.e., on the sale of the property, computed as follows: Depleted cost at date of sale, $43,643.19, which includes the $2,400 shown on the separate *268 account for the Williams tract purchase; less sales price, $329; loss on sale, $43,314.19. On its return petitioner took deductions for long-term capital losses aggregating $252,686.73. Respondent allowed deductions aggregating $305,290.18. Petitioner did not abandon a leasehold interest in sand and gravel in the Williams tract during the taxable year 1941. Petitioner sustained a long-term capital loss upon sale of the Williams fee in the amount of $43,314.19. Opinion The question under this issue arises from respondent's disallowance of a deduction of $39,668.11 as a loss from abandonment. Just what property is claimed to have been abandoned is not clear. In the statement attached to the notice of deficiency respondent's explanation for the disallowance refers to the claim stated in the return. From the statement in the deficiency notice, it appears that petitioner treated the loss as one resulting "from the abandonment of a lease pertaining to gravel lands." In its brief, petitioner contends that it paid $47,334.04 for gravel and sand in place in the tract of land, and that it acquired "ownership" of the gravel "by reason of his purchase," and that the amount paid became *269 the "cost or purchase price" for the gravel. It has been stipulated that * * * the total amount paid by W. D. Haden Company in the acquisition of sand and gravel leases on various properties from the Westpoint Company, the amount of $47,334.04 has been allocated as the cost to the W. D. Haden Company of the lease on the Williams tract, which lease was acquired by W. D. Haden Company on Feb. 14, 1929, * * * The amount which petitioner seeks to deduct is the unrecovered amount of the amounts paid for the lease acquired from Westpoint. Respondent contends that the leasehold which petitioner acquired in 1929 was extinguished under the doctrine of merger, at least by 1939, when petitioner acquired the entire outstanding interest in the fee in the Williams tract. The facts show that the original instrument dealing with the gravel deposit in the Williams tract was a lease given by the owners to Westpoint on June 16, 1928. This instrument had all the characteristics of a lease, including requirements for payment of delay rental, royalty and right of repossession by the lessors for non-payment. It is referred to as a lease in one of its provisions and in subsequent ratifications executed *270 by the owners. Therefore, when the leasehold was assigned to petitioner by Westpoint it was subject to extinguishment by merger with the fee interest which was later acquired by the petitioner. The facts further show that petitioner acquired a six-sevenths undivided fee interest in the Williams tract not later than March 26, 1931. The remaining one-seventh undivided interest was acquired on December 16, 1939, when the tract was partitioned. A merger of the leasehold and the fee interest could only be prevented at this time by proof that petitioner intended to prevent a merger or that a merger was against its manifest interest. Upon a careful review of all the evidence, we can find nothing which prevented a merger. Petitioner claims that its bookkeeping entries show that separate accounts were kept for the leasehold and the fee interests. The evidence is clear, however, that the accounts were inactive in 1939 and we cannot infer an intention to prevent a merger from petitioner's failure to consolidate the two accounts. Petitioner had no property interests which would be jeopardized by a merger. We hold that petitioner's leasehold and fee interests in the Williams tract were merged *271 on December 16, 1939. See Henry Boos, 30 B.T.A. 882. Thereafter petitioner clearly treated its property as merged. In entering into the lease with the Texas Construction Material Company on March 17, 1941, a new lease was created. Petitioner did not assign the original lease of June 16, 1928, which petitioner had acquired from Westpoint on February 14, 1929. The new lease did not refer in any particular to the original lease but rather referred to the Williams property as that described by the warranty deeds to petitioner of the fee interest. While it is true that the remaining one-seventh undivided interest acquired is not specifically mentioned, that interest had been conveyed prior to the execution of this lease, and we consider the omission as immaterial. The lease contained a general clause which covered all of the gravel properties owned or leased by petitioner. The terms and conditions for rent and royalty payments were different than those provided in any previous lease. In Badger Oil Co. v. Commissioner, 42 B.T.A. 521; affd., 118 Fed. (2d) 791; cert. den. 314 U.S. 634, an oil and gas lease was created in 1921, reserving *272 the usual one-eighth royalty. This lease was acquired by the taxpayer in 1926. The lessors also sold an undivided one-third royalty interest to other parties. In 1934 the lessors conveyed their remaining interest in the land to the taxpayer. In the following year the taxpayer conveyed the original lease by assignment. Based on the fact that this lease was assigned and that no new lease was created, it was held that no merger was intended. It was also held in that case that there was no merger because petitioner had not acquired the entire fee interest. In the present case petitioner had acquired the entire fee interest in 1939. But we do not think the decision of the question is affected by petitioner's argument that there was no merger of the leasehold interest in the gravel deposits, or by respondent's argument that there was a merger. The fact is that petitioner acquired the complete interest in the Williams tract, with the exception of the part which remained or went to Add Williams. Thus, petitioner owned the gravel deposits in the land. Petitioner is claiming two losses in the taxable year, a loss on account of an alleged abandonment of the gravel deposits and a loss on account *273 of the sale of the entire fee title to Wansley. When petitioner made the sale to Wansley it sold everything, whatever was left of the gravel deposit and all of the other interests in the land. A loss was definitively established by the sale. Respondent has recognized all of the adjusted cost to petitioner of all of its interest in the tract of land. Thus, petitioner is receiving a long-term capital loss in the amount of $43,314.19, which includes the unrecovered expenditure which petitioner made originally when it acquired a lease from Westpoint. The record does not show the past experience of petitioner with respect to its having made any claims for loss deductions in earlier taxable years relating to the gravel deposits. Paragraph 5 (d) of the petition states that petitioner would rely on certain facts under this issue, some of which were not made the subject matter of proof, but it is stated in the petition that "In 1939 taxpayer attempted to deduct an aliquot part of the remaining cost of the gravel lease as having been abandoned, at the time the partition agreement was negotiated. This loss was disallowed, and since it was disallowed the cost is now included in the computation *274 of the loss for 1941 and here involved." The facts set forth in the above findings of fact show that in 1939 S. & G. Company held a lease from petitioner, and the term of the lease extended until January 31, 1941. The lease was terminated in April or May of 1940, and on March 17, 1941, petitioner gave another lease to Texas Construction Material Company. That company was a large producer of gravel; it was experienced in the business of extracting gravel; and it had the necessary equipment and personnel for producing gravel. The Texas company terminated the lease in 1941 because the operations proved to be commercially unprofitable. There is substantial evidence, consisting of testimony of petitioner's secretary, vice president, and the production manager of Texas Construction Company, which shows that petitioner had concluded before 1941 that it could not profitably produce gravel any longer. This testimony suggests strongly that the gravel deposits lost their useful value so far as petitioner was concerned before 1941, and if that was true a question arises whether the year 1941 was too late a year for petitioner to claim a loss on account of the gravel deposits. Since respondent *275 has not denied petitioner a loss upon the sale of the entire property in 1941. but has allowed a long-term capital loss, we are confronted with a dilemma. If we held on the evidence before us, as we think we might be able to do, that petitioner sustained a loss on the gravel deposits prior to 1941 we think we would then be confronted with another problem, namely, whether petitioner is entitled to the long-term capital loss in 1941 in the full amount which has been allowed. The evidence suggests that there was a time when petitioner could have abandoned the gravel deposits as such and separate from their other interests in the land, but we think that time was past in the year 1941. Petitioner at one time, we presume, worked the gravel deposits and sold gravel to its customers. There is almost no evidence on the point, but it appears that that is the reason why it acquired a lease from Westpoint in 1928. When petitioner was working the gravel deposits it was in a business of producing and selling gravel. It appears that this business activity of petitioner came to an end at some time. Petitioner acquired the fee to most of the Williams tract in order to eliminate the necessity of making *276 payments under the lease that it acquired from Westpoint. We think that the time for taking a loss on account of abandonment happened when petitioner abandoned the business of extracting gravel. The last year in which petitioner extracted any gravel, presumably for sale to its own customers, was in 1940. It appears that that is when petitioner "gave up." Petitioner gave the Texas company a lease in March 1941 for whatever it was worth and when the Texas company terminated the lease in July 1941 petitioner did not make any other efforts to make any leases of the gravel deposits. Within six months petitioner sold the land, obviously to establish a loss. The consideration was nominal. But we think petitioner can not validly claim an abandonment of the gravel deposits in 1941 as something that happened prior to and separate from the sale of the tract of land in 1941, under all of the circumstances. Having abandoned the gravel deposits in the conduct of any of its own business, which we think happened in 1940, petitioner's only remaining practical interest in the land was to deal with it as property. The gravel deposits were part of the realty. Petitioner could lease the land or it could *277 sell it. It elected to do both in 1941. But it was dealing with the rights of ownership in the land and everything in the land and that was entirely different from abandoning gravel deposits which had been used in its business. One can have an old boiler that it uses in its business which becomes useless and antiquated, and under such circumstances one can abandon the boiler. Later it can sell the boiler for scrap. This seems to describe just exactly what petitioner did, upon the record before us. Accordingly, upon the record made, respondent's determination that petitioner is entitled only to a long-term loss upon the sale of the property is sustained. Cf. Butler Consolidated Coal Co., 6 T.C. 183. Issue V - Payment of Attorney's Fees Findings of Fact In 1941, petitioner paid $5,000 for the services of an attorney rendered to petitioner in connection with its own tax liability for the years 1936 and 1937. The services of the attorney, for which the $5,000 was paid, were not devoted to tax problems of another corporation, The Haden Company. Opinion Under this issue, a deduction of $5,000 in the year 1941 only is involved. In the statement attached to the *278 notice of deficiency, the disallowance of a total amount of $5,642.42 is shown as item (h) "Legal Expenses." Respondent disallowed the entire sum upon the ground that it represented legal expenses incurred by petitioner in litigation involving the tax liability for the year 1935 of another corporation, The Haden Company. Petitioner filed an amendment to its petition, amending, inter alia, paragraph 4 (e) of its petition, in which it made separate allegations of error with respect to the disallowance of deduction for $5,000, and the disallowance of deductions for two other items in the respective amounts of $524.17, bond premium, and $118.25, litigation expense. Respondent filed an amendment to his answer, in reply to the amendment to the petition, which omitted any answer to the allegation of error in the disallowance of a separate item of $5,000 for petitioner's own legal expenses. On brief, respondent offers no argument on whether or not the item of $5,000 is deductible, but refers only to the evidence on this item which petitioner offered at the hearing. Respondent has not conceded the item to petitioner, categorically. Neither does he challenge petitioner's evidence. Petitioner *279 has offered evidence which shows that the attorney's fees of $5,000 were paid in 1941 in connection with problems relating to its own tax liability in 1936 and 1937. Where such expenditures are made in connection with the taxpayer's business, they are deductible. Estate of Henry N. Brawner, Jr., 36 B.T.A. 884, 891; Kornhauser v. United States, 267 U.S. 145. Petitioner has overcome respondent's determination with respect to this item, and is entitled to a business expense deduction in the amount of $5,000. Issue VI - Tax Liability of The Haden Company Findings of Fact The Haden Company merged with petitioner in a non-taxable merger as of April 30, 1937, under an agreement of the stockholders of both corporations dated April 15, 1937, which provided, inter alia, as follows: (1) [Petitioner] to acquire all the Assets now owned by The Hadencompany and to assume all liabilities, either actual or contingent as of April 30, 1937. (2) In exchange for the Net Assets so acquired by [petitioner] fromthe Haden Company, the [petitioner] will issue shares of it's [sic] capital stock, having a par value of $100.00 per share; the value of each share so *280 issued from said Assets, to be accepted at the Book Value of the said shares of capital stock of the [petitioner] as of April 30, 1937, and the number of shares so issued to be governed by the book value of the Assets of The Haden Company so acquired. (3) Upon receipt of these shares of capital stock of [petitioner], The Haden Company will distribute to it's [sic] shareholders all of such stock so acquired and immediately after such distribution will dissolve The Haden Company. Nine hundred thirty-three and a half (933 1/2) shares of petitioner's stock were acquired by The Haden Company and distributed to its stockholders in proportion to their stockholdings. The Haden Company was dissolved as of April 19, 1937; the certificate of dissolution was received after April 26, 1937. In recording said merger upon its books of account in 1937, petitioner credited paid-in surplus with $134,025.30, being the book value of 933 1/2 shares of stock obtained from its stockholders for the purpose of consummating the merger, and debited a capital stock asset account with the same amount. Said amount was likewise the value of the net assets acquired from The Haden Company (per books as *281 of April 30, 1937). All known liabilities of The Haden Company had been accrued and set forth in the closing balance sheet as of April 30, 1937. When the assets and liabilities of The Haden Company were recorded upon petitioner's books, their net value of $134,025.30 was credited to the above-mentioned capital stock asset account. The amount of $134,025.30 remained as paid-in surplus upon petitioner's books. Prior to the merger, the books and records of The Haden Company were examined by an internal revenue agent who filed a report dated April 26, 1937, which was transmitted to The Haden Company on May 5, 1937, proposing income and excess profits tax deficiencies for the year 1935. The agent's proposals and the grounds therefor had been discussed with the general auditor of The Haden Company on or prior to the date of said report, but were not agreed to on behalf of said corporation. A protest was filed in due course. No liability for such deficiencies was included in liabilities in the closing balance sheet of The Haden Company as of April 30, 1937. After the merger, by statutory deficiency notice dated October 5, 1937, income and excess profits tax deficiencies were asserted *282 against The Haden Company for the year 1935 upon the grounds stated in the revenue agent's report, but in a lesser amount. Petitioner, being liable for the payment of the deficiencies asserted against The Haden Company, defended in the name of The Haden Company against the assessment of such deficiencies in the Board of Taxappeals, and through the Circuit Court of Appeals (118 Fed. (2d) 285, decision entered March 19, 1941, where the deficiencies were materially reduced. An application for a writ of certiorari in the U.S. Supreme Court was denied on October 13, 1941, (314 U.S. 622). Petitioner incurred litigation expenses in connection with the above litigation in the sum of $118.25 for printing, and $524.17 for a bond premium, both of which were paid in 1941. Both items were deducted on petitioner's 1941 income tax return, but were disallowed by respondent. See item (h) on page 4 of the statement attached to the notice of deficiency $5,642.42, which includes the two above items, totalling $642.42; $5,642.42 is the total of the following - $5,000 for attorney fees, referred to in Issue V, $118.25 and $524.17. Upon demand, during the year 1941 petitioner *283 paid $21,135.98, which was the total of the deficiencies in income and excess profits taxes assessed against The Haden Company for the year 1935, for which petitioner was liable. When the deficiency of $21,135.98 was paid by petitioner this sum was debited to its paid-in surplus account to which petitioner had previously credited the book value of 933 1/2 shares of stock which it obtained from its stockholders for the purpose of consummating the merger with The Haden Company. The above amount was not taken as a deduction in petitioner's income tax return for 1941, but a deduction for this amount is now claimed as a loss by petitioner. Petitioner also paid in 1941 the interest due upon said deficiencies. The total interest was $7,235.32, of which $1,426.68 accrued before April 30, 1937, and $5,808.64 accrued after that date. The total interest was taken as a deduction upon petitioner's income tax return for 1941. It was not disallowed in the statutory notice of deficiency, but by amendment to his answer, respondent contends that $7,235.32 is not an allowable deduction to the extent that it was not a primary liability of petitioner but resulted from a liability as transferee. Respondent *284 has made claim for increase in the deficiency. Opinion There are three items for which petitioner claims deductions under this issue: $21,135.98, tax deficiencies asserted against The Haden Company; $7,235.32, interest paid on the above deficiencies; and $642.42 litigation expenses incurred and paid by petitioner in contesting the determinations made by the respondent against The Haden Company. All of the expenditures were made by petitioner. They grew out of the merger of The Haden Company with petitioner. The questions are whether petitioner is entitled to deduct $21,135.98 as a loss; whether it is entitled to deduct $7,235.32 as either a business expense or as interest expense; and whether it is entitled to deduct $642.42 as a business expense. Respondent contests the allowance of deductions for all of these items. He contends that the payment of the tax deficiencies of The Haden Company constitutes additional cost to petitioner of the assets acquired from The Haden Company, and that therefore $21,135.98 represents a capital expenditure. He contends that the petitioner cannot deduct the amount paid for interest on the deficiencies as interest, but that this expenditure is *285 also an additional cost of assets acquired; and that the litigation expense is an additional cost of assets. Respondent contends, also, that the agreement between the stockholders of both corporations provided for the payment of liabilities for taxes and interest. Finally, it is urged that since gain or loss was not recognized in the tax-free merger here involved, it would be improper to allow a loss deduction for a deficiency later paid by petitioner. Petitioner contends that the existence of a tax deficiency was not known or ascertained at the time of the merger and that petitioner did not intend to assume all liabilities "whatever they might prove to be." The petitioner also argues, in substance, that when it acquired the assets of The Haden Company the liability to pay the tax deficiency was zero, and the subsequent payment of the deficiency is therefore a loss. Inherent in this argument is the fact that no tax deficiency was included in the liabilities of The Haden Company in determining the amount of the stock to be paid by petitioner for the assets acquired. Petitioner relies upon John T. Furlong, 45 B.T.A. 362; the holding under issue II in Koppers Co., 3 T.C. 62, 66; *286 affirmed on another issue sub. nom. Commissioner v. Breyer, 151 Fed. (2d) 267; Esperson v. Commissioner, 127 Fed (2d) 370; Michael Carpenter Co. v. Commissioner, 136 Fed. (2d) 51. The Furlong and Koppers Co. cases are distinguishable from this case on the facts. In those cases, as here, the taxpayers expended amounts to discharge tax deficiencies of other taxpayers which had been liquidated, but in the Furlong and Koppers Co. cases, there had come to an end the investments of Furlong and Koppers Co. in other enterprises, and Furlong and Koppers Co. had sustained losses for which they were entitled to loss deductions, respectively. The amounts expended by them to discharge tax deficiencies of other concerns increased the losses. It was said in the Koppers Co. case, supra, p. 67, that: They [the payments of taxes and interest] were parts of, and for purposes here draw their character from, the gain or loss transactions above. The effect of the payment of the income tax and interest of the Koppers Kokomo Co., was to reduce the price received by petitioner on the sale of the Koppers Kokomo stock. Similarly, the income taxes with interest *287 paid by petitioner for Bexley and Falmouth Companies were factors in fixing the amounts of the losses finally sustained by petitioner from the liquidations of those corporations. ( Italics added.) The deductions allowed in the above cases were loss deductions. In this case, petitioner has not yet sustained any gain or loss which can be recognized for tax purposes on the transaction under which petitioner gave its own stock in exchange for the assets of Haden Company. It has been stipulated that the transaction constituted a non-taxable merger, and that no gain or loss was recognized at the time the assets were received by petitioner. The payments by petitioner of tax deficiencies of Haden Company in a later year served to increase the cost of the assets which were acquired. In our opinion the question of the deduction claimed for the payment of The Haden Company's tax deficiencies is controlled by Holdcroft Transportation Co. v. Commissioner, 153 Fed. (2d) 323 (decided February 21, 1946). In that case the taxpayer, a corporation, commenced business on November 1, 1939, having on that day acquired the business and assets of a partnership in a tax-free exchange for *288 the corporation's common stock. The corporation assumed the liabilities of the partnership. The liabilities included two claims for damages which were then pending and litigation was thereafter conducted by the corporation. It settled the claims by payment of $7,552 for damages, plus $17.59 for costs, $15 for bond and $276.27 for attorney's fees, or a total of $7,860.86, which was deducted as a "law expense" in the taxable year and disallowed by the Commissioner. The corporation contended that since the claims were contingent and unliquidated when the assets were acquired in a tax-free exchange, and since the amounts paid in settlement were for the purpose of preserving the credit of the company, the payments should be deductible as business expenses. In affirming our decision ( T.C. Memo. [3 TCM 147], decided May 10, 1945), in which we had allowed the claim for attorney's fees, but held that the balance of the payments were capital expenditures, the court said: * * * The payment by petitioner of the claims against the partnership reasonably can be attributed only to the assumption by petitioner of liability for those claims. The claims did not arise out of the operation *289 of the business of petitioner. The expense of settling them was not an operating expense or operating loss of that business, but a part of the cost of acquisition of the property of the partnership; and the fact that the claims against the partnership were contingent and unliquidated at the time of acquisition is not, in our opinion, of controlling consequence. [Cases cited.] The court further said: The petitioner asserts that, because it acquired the assets of the partnership in a taxfree transfer by virtue of § 112(b)(5) and § 113(a)(8) of the Internal Revenue Code [26 U.S.C.A. Int. Rev. Code, § 112(b)(5) and § 113(a)(8)], petitioner is in the same position with respect to expense and loss deductions as its predecessor would have been in if there had been no transfer. This contention is unsound. The statutes referred to expressly relate to the basis for determining gain or loss upon the sale or exchange of property. * * * For the same reasons, it is held here that the payment by petitioner of its predecessor's tax liability, which it had assumed in a nontaxable merger, was a capital expenditure and that the amount paid is *290 not deductible from gross income. In Michael Carpenter Co., supra, it was held that the receipt of processing tax refunds, the claim for which had not been included in the inventory of assets transferred in a tax-free transaction, constituted income to the successor since "no consideration passed therefor." But there the refund would have been income in the hands of the transferor. Here the payment of the deficiency could not have been deducted by petitioner's transferor, The Haden Company. In our opinion, the Michael Carpenter Co. case is not applicable in this proceeding. Esperson v. Commissioner, supra, is distinguishable upon its special facts. With respect to the question relating to petitioner's claim for deduction of $7,235.32, the total amount paid for interest upon the deficiencies, we are of the opinion that the amount of the interest which accrued after the date of the merger, $5,808.64, is deductible qua interest under section 23(b) of the Internal Revenue Code. It is so held on authority of Koppers Co., supra, issue I, p. 65. We have recently taken the position that we adhere to the rule expressed in the *291 holding under issue I in the Koppers case. See Robert L. Smith, 6 T.C. 255; Philip D. Armour, 6 T.C. 359, and Edith K. Timken, 6 T.C. 483. It is held that the amount of $1,426.68, the interest which accrued on the deficiencies prior to the merger, is not deductible for the same reasons set forth above for disallowing deduction for the amount of the deficiencies. The final question is whether $642.42, cost of the bond and printing expenses, incurred and paid by petitioner in litigation involving the above tax deficiencies of the Haden Co. is deductible by petitioner as a business expense under section 23(a)(1)(A). The expenses were for items which petitioner itself incurred, and were not incurred by Haden Co. Petitioner was directly liable for the expenses. It is held that petitioner is entitled to deduct the above amount. Joshua C. Kelley, 38 B.T.A. 1292, and cases cited therein. Issue VII - Haden Lime Company Transaction Findings of Fact Petitioner built a lime manufacturing plant on Green's Bayou about fifteen miles from Houston, Texas, at a cost of over $320,000. When the plant was completed it was discovered that there *292 was no authorization in petitioner's charter to engage in the manufacture of lime, whereupon The Haden Lime Company, hereinafter called the Lime Co., was organized under the laws of Texas for the purpose of conducting this business. The new company issued 3,000 shares of preferred stock to petitioner and 3,000 shares of common stock to others. From 1930 to the end of 1941 petitioner owned the entire issue of preferred stock (par $100,000) of the Lime Co. at a cost basis of $300,000. The common stock (no par value) of the Lime Co. was owned in 1941 as follows: W. D. Haden
278,000 shares
C. R. Haden
1,000 shares
W. A. Wansley
1,000 shares
Others
20,000 shares The first three named stockholders had owned their stock since its original issue. The common stock of petitioner from 1938 to 1941, inclusive, was owned as follows: W. D. Haden
4,400 shares
C. R. Haden
300 shares
W. A. Wansley
300 shares
The majority of the board of directors of the Lime Co. and petitioner, respectively, were the same persons in 1941. The Lime Co. employed a patented process for manufacturing lime from oyster shell. The patent was owned by the company but was *293 later transferred to petitioner. It was thought that the process would provide petitioner with an outlet for its manufacture of shell. Petitioner also purchased lime from the Lime Co. which it sold to its customers. Officers of petitioner had envisaged a great need for lime in the Houston area where the supply of shell was almost inexhaustible. But the cost of building the plant had been ten times greater than the amount which established competitors had required for the production of lime from limestone. While the shell product was considered to be of slightly better quality, the limestone product had a whiter color which was more desirable for masonry. In addition to these competive disadvantages the process of manufacturing from shell was adopted by others, first by a company in Louisiana and later by two companies in Texas. Petitioner commenced suit for infringement which resulted in an adverse judgment. On September 13, 1941, the judgment was affirmed on appeal ( W. D. Haden Company v. Mathieson Alkali Works, 122 Fed. (2d) 650). Certiorari was later denied by the Supreme Court on February 9, 1942. The Lime Co. had operated at a loss from 1930 to 1941, inclusive. *294 Advances were made by petitioner to the Lime Co. when and as needed, with the understanding that they would be paid when and as they could be paid back. Other creditors were paid promptly in order to obtain cash discounts. As of December 1941 the Lime Co. owed petitioner $82,019.47. This amount represented a consolidation of two open accounts as of April 30, 1941. One account having a debit balance of $23,232.31 on April 30, 1941, was created by cash loans, assumption of liabilities, and payment of expenses by petitioner for the Lime Co. during the period from 1930 through 1936, inclusive. The other account had a debit balance of $61,070.40 and was a running account from 1930 to 1940, inclusive, in which the principal items of debit were for shell sold by petitioner to the Lime Co., and the principal credits were sales of lime to petitioner and cash payments on account. On or about December 18, 1941, the Lime Co. received an offer for the purchase of either its plant or its outstanding capital stock. On the same date a special meeting of the board of directors of petitioner was held for the purpose of considering a proposal made by the Lime Co. to redeem the preferred stock owned *295 by petitioner. The material portions of the minutes of this meeting follow: A letter written by C. R. Haden, Treasurer and General Manager of The Haden Lime Company, was read which disclosed that a proposal had been made by Tom H. Elliott, 1331 Commerce Bldg., Houston, Texas, to The Haden Lime Company to buy either the physical assets of The Haden Lime Company for $60,000.00 or as an alternate to buy the capital stock of said company for $70,000.00; to pay at least 15% in Cash and the balance to be paid over a period of four years. The Haden Lime Company agreed that should such sale be agreed to by [petitioner] that the entire proceeds of such sale be turned over to [petitioner] in consideration of the surrender by [petitioner] of the $300,000.00 of preferred stock of The Haden Lime Company in complete redemption thereof. Motion was made by W. D. Haden, seconded by W. A. Wansley and carried by vote of all present that the sale of the stock not be considered since it was apparent that a price of $10,000.00 was being offered for the name and good-will of The Haden Lime Company and [petitioner] would not permit the use of the name "Haden" unless such company was owned directly *296 or indirectly by the Haden interests. Motion was made by W. D. Haden, seconded by W. A. Wansley, that Edwin E. Lund, Auditor, be appointed to confer with Tom H. Elliott in order to determine whom he represented and as to whether these people were responsible before taking any further action. On December 26, 1941, the board of directors of the Lime Co. authorized the sale of its physical assets for $60,000, payable $15,000 in cash and $45,000 in notes secured by a mortgage. The sale was completed prior to the close of the year 1941. The directors also approved the following resolution: Resolved that, whereas the [petitioner] having spent some $300,000.00 in the erection and construction of the lime manufacturing plant for which The Haden Lime Company issued its 6% cumulative preferred stock in the amount of $300,000.00 on July 3, 1930, and whereas the [petitioner] has never realized any return on such investment from the date of issuance of such stock, and whereas, the [petitioner] has made it possible for this plant to operate by extending unlimited credit during these many years by supplying said plant with raw materials for the manufacture of Lime for which [petitioner] *297 has been paid only in part, that the entire proceeds of the sale of such plant be paid over to them in redemption of the preferred stock of $300,000.00 there being sufficient cash and liquid assets to satisfy all common creditors claims with the exception of the past due account owing to [petitioner] and, that C. R. Haden and Edwin E. Lund be appointed as Liquidating Trustees to take over all the Cash and chooses [sic] in action of The Haden Lime Company in complete liquidation thereof and to pay all common creditors out of the proceeds within 30 days with the exception of [petitioner's] past due account and upon the expiration of such 30 day period to assign to [petitioner] all chooses [sic] in action not liquidated to be applied on the past due open account. On the same date the board of directors of petitioner met to pass upon the proposed redemption of the preferred stock of the Lime Co. and approved the following resolution: Motion was made by W. A. Wansley, seconded by W. D. Haden and carried by vote of all present, that whereas, the [petitioner] had invested $300,000.00 in the cumulative preferred stock of The Haden Lime Company in February of 1930 and had to *298 date never realized any return from such investment and was now carrying an open account for materials furnished said company in an amount of some Eighty Thousand odd Dollars long past due which from past experience The Haden Lime Company would be unable to pay, and whereas. The [petitioner] having spent some $120,000.00 in Attorneys fees and court costs in the past three years in prosecution of a suit brought against Mathieson Alkali Co. for infringement of a patent on the manufacture of lime from Oyster shell and having lost in both lower and higher courts, there is no incentive to retain said preferred stock and the proposal by The Haden Lime Company to redeem such stock for $60,000.00 be accepted, provided however, that trackage and right-of-way agreements so as to protect [petitioner's] property adjoining The Haden Lime Company's property to be agreed upon before the passing of title. After the sale of the plant for $60,000 and the payment of the proceeds of $60,000 to petitioner, the Lime Co. paid all of its other outstanding accounts in the amount of approximately $5,000. The Lime Co thereupon had $60,043.38 in cash, notes receivable and inventory on hand. The Lime Co. *299 paid $60,043.38, made up of cash, notes, etc., as described above, to petitioner. Thus petitioner actually received from the Lime Co. $120,043.38. When petitioner received $60,043.38 from Lime Co., petitioner applied that total amount as a credit against the balance due to it on the open account, leaving, per books, an unpaid balance of $21,975.99. Petitioner did not apply any part of the sum of $60,000 to the payment of the remaining balance in the open account but charged the balance of $21,975.99 to profit and loss. Petitioner applied $60,000 in its books to the redemption of Lime Co. preferred stock. Petitioner carried an account on its books showing $300,000 as the cost of stock in the Lime Co. Upon applying $60,000 to the redemption of preferred stock, there remained as a balance in this account the sum of $240,000. Petitioner's accountant charged off $240,000 as a capital loss. The Lime Co. surrendered its charter and was dissolved December 31, 1941, the dissolution having been voted and consented to in writing on December 26, 1941, by the first three common stockholders named above, who owned 93.33 percent of the outstanding common stock. The preferred stock of the Lime *300 Co. was preferred over the common stock as to dividends and as to assets in liquidation, but was not preferred over creditors. It was redeemable on not less than 30 days prior notice. The Lime Co. sustained a loss upon the sale of its plant, and the company had no accumulated surplus. Petitioner voluntarily released Lime Co. from its debt to the extent of $21,975.99. The indebtedness of the Lime Co. did not become worthless during the taxable year in view of petitioner's receipt of $60,000 which more than offset the balance of $21,975.99. Petitioner sustained in 1941 a capital loss in the amount of $261,975.99 on the stock of the Lime Co. Opinion Petitioner does not deny respondent's assertion that it received two payments from the Lime Co. in 1941, prior to its dissolution, aggregating $120,043.48. But, petitioner contends that the Lime Co. did not have more than $60,043.48 to apply on its debt to petitioner. This argument presumes that petitioner's claim against the assets of Lime Co., as a stockholder, can be put first and ahead of petitioner's claim against that company as a creditor. In making this argument petitioner contends that there was a redemption of the preferred *301 stock for $60,000 pursuant to a "bona fide contract" between the Lime Co. and petitioner evidenced by the resolutions of the respective directors of the two companies on December 26, 1941. We agree with respondent that petitioner's argument is not sound. The alleged "bona fide contract" between the Lime Co. and the owner of its entire issue of preferred stock, as represented by the resolutions set forth in the findings of fact, was not a real contract, and if it can be said to have been one, it was not an arms-length contract. The Lime Co. was controlled by petitioner's chief stockholder, W. D. Haden, who owned the major part of the common stock of both corporations. The directors of both corporations were the same persons. The resolutions, for whatever reasons they were adopted, and whether or not they were adopted pursuant to some mistaken judgment, amounted to no more than a decision to use $60,000 of funds in redemption of preferred stock, rather than in payment of a claim of a creditor, under controlled conditions, at the suggestion of W. D. Haden, the holder of all of the preferred stock and the creditor being the same person, petitioner. Respondent argues that there is much *302 in the circumstances to suggest that the socalled advances which petitioner had made to Lime Co. were contributions to capital rather than loans, but he assumes, arguendo, that a debtor-creditor relation existed between the two companies. Respondent points out, that when petitioner consented to take $60,000 in redemption of the preferred stock, in spite of the existence of the unpaid balance of $21,975.99 in the open accounts, petitioner elected voluntarily to release its debtor from payment of part of the debt. We agree with respondent's construction of petitioner's action in adopting the resolution on December 26, 1941. Petitioner, a separate corporate entity, was a creditor of Lime Co., and its claim as a creditor was entitled to preference, ahead of its claims as a preferred stockholder. It has been found as a fact that petitioner voluntarily released Lime Co. from its obligation to pay petitioner the debt of $21,975.99. Lime Co. owed other creditors $5,000; and it owed petitioner $82,019.47 on the so-called open accounts; total $87,019.47. After paying all other creditors $5,000, Lime Co. had $120,043.48 to apply to the $82,019.47 debt due petitioner. The indebtedness of Lime *303 Co. was one which could be collected in full. Petitioner's voluntary release or cancellation of part of the debt, to the extent of $21,975.99, did not result in worthlessness of the debt within the meaning of section 23(k) of the Internal Revenue Code, as amended by section 124 of the Revenue Act of 1942. See Mertens, Laws of Federal Income Taxation, (1942), Vol. 5, section 30.37; American Felt Co. v. Burnet, 58 Fed. (2d) 530; Uhl Estate Co., 40 B.T.A. 1223, 1231; affirmed 116 Fed. (2d) 403. The disallowance of the deduction is sustained because the alleged debt did not become worthless in the taxable year. Respondent agrees that petitioner is entitled to a long-term capital loss in 1941 on the preferred stock of Lime Co. which cost petitioner $300,000. He has determined that petitioner received only $38,024.01 in redemption of the stock, (the balance of $60,000, after applying $21,975.99 thereof to the balance due petitioner on the open accounts) His determination results in $261,975.99 as the capital loss on the stock. That determination is correct. The holdings made under the seven issues presented appear to require *304 recomputation of the deficiencies under Rule 50. Respondent has made claim for increase in the deficiency for 1941, under section 272(c) of the Internal Revenue Code. Decision will be entered under Rule 50. Footnotes
1. Regulations 103, p. 31; section 19.22(a)-2.↩
1. SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *↩
1. THE STATE OF TEXAS, COUNTY OF GALVESTON] At a Special meeting of the Board of Directors of W. D. Haden Company, a corporation, held at its office on the 27th day of November, 1940, at Galveston, Texas, the following motion was made by W. A. Wansley, seconded by W. D. Haden and was unanimously adopted: "Whereas, an exchange of property has been offered the corporation whereby the property belonging to The Texas Company in the Old Depot Grounds at Harrisburg is offered for a strip of land owned by W. D. Haden Company adjoining The Texas Company's property in the Old Depot Grounds at Harrisburg, Harris County, Texas, the President of this corporation is hereby authorized to execute a Deed on behalf of this corporation to A. S. Beeley to effectuate said exchange, delivery of said Deed to be made upon delivery to this corporation of a Deed from The Texas Company of the land in the Old Depot Grounds now owned by them, said conveyance to be acceptable to our Attorneys."↩
2. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely in Kind. - (1) Property Held for Productive Use or Investment. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩